ROLOFF EVANGELISTIC ENTERPRIS-
ES, INC., et al., Appellants,

v.

The STATE of Texas, Appellee.

No. 12589.

Court of Civil Appeals of Texas,
Austin.

Oct. 5, 1977.

Rehearing Denied Nov. 2, 1977.

Clyde J. Jackson, Jr., Alsup & Alsup,
Corpus Christi, Fred P. Benco and David C.
Gibbs, Jr., Parma Heights, Ohio, for appel-
lants.

John L. Hill, Atty. Gen., M. Lynn Taylor,
Asst. Atty. Gen., Austin, for appellee.

PER CURIAM.

This appeal presents the question of
whether child care homes operated by ap-
pellants, admittedly religious in nature, are
subject to the provision of the Child Care
Licensing Act, Article 695a–3, Vernon's
Civil Statutes, effective January 1, 1976.

At the outset of trial, the court granted
the State's motion for summary judgment
ordering appellants to secure licenses to op-
erate its three child care homes and to
admit agents of the Texas State Depart-
ment of Public Welfare for the purposes of
inspection. The court's order, in essence,
requires permanent compliance with the
Child Care Licensing Act.

This appeal presents, essentially, three
questions. The first is whether or not there
were any disputed fact situations that
would have precluded the trial court from
entering summary judgment; the second is
whether appellants' constitutional rights to
the free exercise of religion are abrogated
in any way by the Act; and the third is
whether the trial court was correct in over-
ruling the plea of privilege of appellant
Roloff Evangelistic Enterprises wherein it
asserted its right to be sued in one of the

three counties in which a children's home is located.

There is no dispute but that the State made a *prima facie* case under Article 695a–3, Section 23 of the Child Care Licensing Act. This Act requires three essential elements of a cause of action: "Any person . . . who operates a facility without a license or certification as required under this Act" is subject to certain enumerated penalties.

Thus, it became incumbent upon appellants to assert some affirmative defense against the enforcement of the Act which they attempted to do by alleging the Act to be unconstitutional as applied to them.

I

To state appellants' position here, we quote from their brief:

"It has been a consistent and unwavering position on the part of Appellants that the Child Care Licensing Act and the Minimum Standards promulgated thereunder violate their religious convictions.

"Thus, Reverend Roloff has testified:

'This is the very heart of the battle. The State Department of Public Welfare doesn't have any leadership over my church, you see.'

\*   \*   \*   \*   \*   \*

"Reverend Roloff has testified, for example, that he objects to State control over the children in his ministry:

'We cannot comply with this standard since we are not responsible to the State in this matter of raising the children . . . but to God and the parents who have placed with us the sole responsibility to raise these children in a Godly manner. See, e. g., Exodus 20:12; Proverbs 1:8, 9; Proverbs 4:1–9; Mark 12:17.'

\*   \*   \*   \*   \*   \*

"Q:  [By the State]: 'Let me ask you this question right here. Now, I think I've heard you say in court, probably can find it here if we looked, that you operate the Enterprises solely based upon authority you find in the Bible, is that correct?'

"A:  [By Rev. Roloff]: 'That certainly would be the basis of the operation.'

\*   \*   \*   \*   \*   \*

"Q:  'It's solely on the Bible?'
"A:  'That's my conviction.'

\*   \*   \*   \*   \*   \*

"Q:  'And that's the basis for your contention that you are not subject to the Child Care Licensing Act?'
"A:  'That's correct. There are conflicts that I cannot conscientiously go by and go by my Bible at the same time.'

\*   \*   \*   \*   \*   \*

"Preachers from around the country have testified that they themselves, along with thousands of Christian believers, share the conviction that the State cannot control the Christian upbringing of children in a ministry such as the Enterprises:

"Q:  [By Attorney Gibbs]: 'Do you share those same beliefs?'
"A:  'Yes sir, I do.'

\*   \*   \*   \*   \*   \*

"Q:  'Are those religious comvictions [*sic*] to your knowledge shared by a substantial number of believers at large?'
"A:  '[I] find that there are hundreds of thousands of people who share these religious convictions.' (Testimony of Reverend Gary Coleman)

\*   \*   \*   \*   \*   \*

"In addition, preachers have testified under oath that they, too, would resist licensing by the State over legitimate Christian ministries dealing with children:

"Q:  [By Attorney Gibbs]: 'In regard to your beliefs which you share with Reverend Roloff, could you sanction or allow a licensing procedure to be placed upon you?'
"A:  [By Rev. Clayton]: 'No, I could not.'

\*   \*   \*   \*   \*   \*

"THE COURT: 'Well, ask him—If that is your contention then ask him the

question of whether or not it violates his Biblical belief for state officials to inspect the home.'

"THE WITNESS: 'Yes, it would.'

"THE COURT: 'You say it would?'

"THE WITNESS: 'Yes, it would.' (Testimony of Reverend Harold Clayton)

\* \* \* \* \* \*

At the hearing on summary judgment, the trial court, in an overabundance of caution, asked appellants to list the fact issues they considered to be questions for a jury. Appellants then stated the first issue, or fact question, was whether appellants' enterprises are operated pursuant to legitimate biblical convictions of Lester Roloff; the second, whether the aforesaid convictions are legitimate and truly held and consistently practiced by Lester Roloff and those participating in the ministries of the enterprises; the third, whether the aforesaid convictions are consistently practiced and have been the life style and the basis of all actions at the homes and ministries of the enterprises; the fourth, whether the aforesaid convictions are totally based on biblical teachings and practices dating back to the historic record of the Old Testament, have been truly held and practiced by large numbers of Christian believers through the ages to the present; the fifth, whether the Child Care Licensing Act and the minimum standards promulgated thereunder violate the aforesaid convictions when applied; the sixth, whether all of the compelling interests of the State can be adequately carried into effect and duly protected through the reasonable implementation of other State laws.

The court correctly assessed numbers 5 and 6 to be questions of law and the remainder of the alleged questions of fact were there and then agreed to by the State. Consequently, there was nothing left for the court but to apply the applicable law to the undisputed facts. *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934 (Tex.1972); *Gulf, Colorado & Santa Fe Ry. Co. v. McBride*, 159 Tex. 442, 322 S.W.2d 492 (1958); *Torres v. Western Casualty & Surety Co.*, 457 S.W.2d 50 (Tex.1970).

## II

Given the facts described above, the gist of appellants' case then becomes whether the control over children's homes vested in the State Department of Public Welfare as set forth in Article 695a–3 impinges on appellants' free exercise of religion guaranteed by the first amendment of the Constitution of the United States.

Even though appellant Roloff and other witnesses for appellants earnestly and vehemently assert that such a conflict exists and further, that the facts of such conflict should be put to a jury, we hold that the testimony is nothing more than a bald conclusion entirely unsupported by any factual evidence from which a jury could draw a differing conclusion.

Thus we do not reach the cases cited by appellants [1] where the Supreme Court of the United States strikes down laws that infringe upon religious beliefs and practices; nor do we reach those cases cited by the State [2] where religious practices have been somewhat curbed where they conflict with State regulatory laws.

Section 1(b) describes the legislative intent underlying the Child Care Licensing Act as being ". . . to protect the health, safety, and well-being of the children of the state who reside in child care facilities."

To accomplish this intent, the Act establishes statewide minimum standards for the safety of such children, ensures maintenance of these standards by inspection and

---

1. *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *People v. Woody*, 61 Cal.2d 716, 394 P.2d 813 (1964); *State of Ohio v. Whisner*, 47 Ohio St.2d 181, 351 N.E.2d 750 (1976).

2. *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244 (1878); *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

interviews, and regulates conditions in the facilities through a program of licensing. The entire purpose of the Act is to protect the physical and mental well-being of children residing in such facilities.

Indeed, Section 1(b) expressly states: "It is the further legislative intent that the freedom of religion of all citizens shall be inviolate. Nothing in this Act shall give any governmental agency jurisdiction or authority to regulate, control, supervise, or in any way be involved in the form, manner, or content of any religious instruction or the curriculum of a school sponsored by a church or religious organization."

The facts of this case disclose that there is no question as to the sincerity of appellants' religious beliefs. The problem for this Court has been to ascertain wherein the exercise of these beliefs conflicts with the statute.

■ It then becomes apparent that in applying the statute to the undisputed facts, its provisions do not in any way conflict with appellants' beliefs, nor do they restrict the exercise of those beliefs in any way.

### III

Appellant Roloff Evangelistic Enterprises filed a plea of privilege under the provisions of Article 1995, V.C.S., wherein it attempted to remove the suit from Travis County to Nueces County or to either of the two other counties in which it maintains a children's home.

Appellant Roloff Evangelistic Enterprises contends here that since the State has never filed an affidavit controverting such plea, as required by Rule 86, Tex.R.Civ.P., that the trial court erred in refusing to grant the plea and order the cause transferred.

The question then became whether the State had been served with a copy of appellant's plea of privilege as required by Rule 86, Tex.R.Civ.P., this question was put in issue and, after hearing evidence, the trial court ruled that the State had not been so served.

Appellant now argues that even though the State was not served with a copy of the plea, the court still erred in failing to grant appellant's plea of privilege. We cannot agree.

■ The law is well settled that when the language of a statute or rule is clear and unambiguous, its mandate must be followed precisely as written.[3]

Rule 86 is as follows:

". . . *A copy of such plea of privilege shall be served on the adverse party or his attorney of record by actual delivery in person to him or by mailing a copy of such pleading to him by registered mail return receipt requested. If such adverse party desires to controvert the plea of privilege, he shall within ten days* after *he or his attorney of record received the copy of the plea of privilege file a controverting plea under oath, setting out specifically the grounds relied upon to confer venue of such cause on the court where the cause is pending."* (Emphasis added)

■ We hold that Rule 86 requires the moving party to serve the adverse party with a copy of the plea. Only if the adverse party was served with a copy must the plea be controverted.

The judgment of the trial court is in all things affirmed.

---

**3.** *Franklin v. Pietzsch*, 334 S.W.2d 214 (Tex.Civ.App.1960, writ ref. n. r. e.).