The **STATE** of North Dakota, Plaintiff and Appellee,

v.

Blaine L. **GOEHRING,** Defendant and Appellant.

Cr. No. 1083.

Supreme Court of North Dakota.

Oct. 1, 1985.

As Corrected Oct. 15, 1985.

---

Wayne D. Goter, Asst. State's Atty., Mandan, for plaintiff and appellee; argued by Mr. Goter.

Evans & Moench, Bismarck, for defendant and appellant; argued by Deborah J. Carpenter.

ERICKSTAD, Chief Justice.

Blaine Goehring has appealed his conviction in the County Court of Morton County, for driving with a suspended driver's license in violation of Section 39–06–42, N.D. C.C. We reverse.

On the afternoon of October 24, 1984, Blaine Goehring was driving his employer's 1978 Chevy van along the intercity loop of I–94 in Morton County. Goehring was flagged over by Scott Brand, a North Dakota Highway Patrolman, for the sole purpose of conducting a routine safety check of the vehicle. Goehring had committed no traffic offense and his vehicle had no apparent safety defects.

Officer Brand was required to conduct 300 safety checks a year. He was given discretion as to where and when he would conduct these checks. Officer Brand testi-

fied that the safety checks were conducted according to the policies and procedures established by the North Dakota State Highway Patrol, but the record does not indicate what these policies and procedures are.

After completing the safety check and discovering no safety violations, Officer Brand asked to see Goehring's driver's license. Requesting to see a driver's license is Officer Brand's normal procedure, even when there is no reason to suspect the driver to be in violation of the law. Goehring handed Officer Brand an expired North Dakota driver's license. As the license had expired, Officer Brand ran a check by radio through the North Dakota State Highway Department, Driver's License Division. The check indicated that Goehring's license had been suspended for a second DUI conviction within 24 months. Goehring was then placed under arrest for driving with a suspended driver's license and taken to the Morton County jail.

On November 2, 1984, Goehring made a motion to dismiss the case on the basis that the vehicle safety check was a constitutionally impermissible search and seizure under the Fourth Amendment of the United States Constitution, that there was no probable cause to believe his driver's license had been suspended, and that a vehicle equipment check was not a proper basis for demanding a driver's license. He relied heavily on *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). The State argued that there was no legal basis for granting this motion and that even if there were, the vehicle safety inspection did not violate Goehring's Fourth Amendment rights. The trial court denied the motion without comment.

This motion to dismiss was renewed January 23, 1985, just prior to the commencement of the trial and, in the alternative, it was requested that the evidence relating to the suspension of Goehring's license be suppressed. The renewed motion was made orally without any advance notice to the court or the State. The trial court again denied the motion stating that it had already ruled on the motion to suppress as well as the motion to dismiss. The court reasoned that *Prouse* was factually distinguishable from the case at hand in that the officer in *Prouse* was not following any guidelines or practices established by the department with which he was employed.

In essence, Goehring is challenging the trial court's admission of evidence which he alleges was derived from an unconstitutional search. His position is that the safety inspection conducted by Officer Brand was a "random stop" and, therefore, constitutionally impermissible according to *Delaware v. Prouse, id.* Goehring argues further that, since the stop was impermissible, the evidence derived from the stop should have been excluded as the "ill-gotten fruit of the poisonous tree."

## I

The State urges that we affirm the trial court's decision denying both the motion to dismiss and the motion to suppress. This decision, the State believes, should be based upon procedural grounds and not the Fourth Amendment search and seizure issue. It is urged by the State that the motion to dismiss and the renewed motion to dismiss were properly denied because the motions were not based on proper grounds for dismissal. The State lists the statutory grounds for dismissal,[1] none of which were argued or cited by Goehring.

It is also urged by the State that the motion to suppress was properly dismissed because the motion was not made in a timely manner. A motion to suppress evidence on the grounds that it was illegally obtained must be made prior to trial. Rule 12(b)(3), N.D.R.Crim.P. Such a motion, un-

---

**1.** Section 29–10.1–10, N.D.C.C. (improper selection of grand jurors), Sections 29–33–01, 29–33–03, and 29–34–01, N.D.C.C. (failure to inform or bring a prisoner to trial pending a charge), Section 12–53–18, N.D.C.C. (fulfillment of conditions of probation after deferred imposition of sentence), Section 39–06.1–03, N.D.C.C. (failure to appear or proceed with prosecution), Section 12.1–04–05, N.D.C.C. (when defendant is unfit to stand trial due to mental incapacity), and Rule 48, N.D.R.Crim.P. (for denial of speedy trial or upon motion of the State).

less otherwise permitted by the court, must also be filed with the clerk at least three days before the date of hearing. Rule 3.2(a), N.D.R.O.C. A failure to move to suppress evidence in a timely manner constitutes a waiver of that defense. *State v. Demery*, 331 N.W.2d 7, 13–14 (N.D.1983), *State v. Hager*, 271 N.W.2d 476, 479 (N.D. 1978). The State argues that since the motion to suppress was first made in the judge's chamber just prior to the commencement of the trial, it was not timely made pursuant to Rule 3.2(a) N.D.R.O.C. and was therefore properly dismissed.

■■■ The purpose of Rule 3.2(a) N.D.R.O.C., in requiring a motion to suppress be filed three days before a hearing, is to afford the opposing party notice and a fair opportunity to respond to the motion. *State v. Teigen*, 289 N.W.2d 242, 244 (N.D. 1980). The State argues this policy in these words:

"There is no justification for allowing a party less than one day to prepare to meet questions raised by an adversary on a motion. The State is entitled to a reasonable time to investigate the circumstances, prepare a response, and support the response with a brief and oral argument."

There is no lack of notice in the instant case. The legal issue raised by the initial motion to dismiss was the same as the legal issue raised by the renewed motion to dismiss and the motion to suppress; that is, the constitutionality of Goehring's stop and the use of the evidence resulting from this stop. The State had to be cognizant of this issue when Goehring made his initial motion to dismiss more than two months prior to trial. The State was given time to respond and fully discussed this issue in its brief resisting the motion to dismiss.[2]

2. The State alleged during oral argument that it was misled because the motion was titled a motion to dismiss instead of a motion to suppress. The State uses the following argument to illustrate the significance of this improperly labeled motion: This improper title caused the State to overlook the constitutional issue and respond procedurally as though this were only a motion to dismiss. On a motion to dismiss, the party making the motion has the burden of proving proper grounds for the motion. On a motion to suppress, however, the State has the burden of proof and an evidentiary hearing would have been held, at which time the State could have brought in evidence to combat the motion. As this motion was not labeled a motion to suppress, there was no evidentiary hearing and thus no opportunity for the State to submit evidence relevant to the constitutional issue.

This argument ignores Goehring's brief in support of his motion to dismiss and the State's brief in response to this motion. The first sentence of Goehring's argument in his brief in support of his motion to dismiss stated:

"The issue is whether the officer may make a random stop, proceed with a routine safety check and then demand a Defendant's drivers license for the purposes of determining whether or not he is under suspension."

Goehring's brief went on to cite from *Delaware v. Prouse* and analyze this case throughout the remainder of the brief. The State, in its brief resisting the motion to dismiss, made the following response to this argument:

"As the Court will note, the defense cited only one case in support of their motion to dismiss and that is *Delaware v. Prouse*, 440 U.S. 648

[99 S.Ct. 1391, 59 L.Ed.2d 660] (1979). The defense failed to provide the Court with a copy of that case, however, the State is doing so and a copy is attached hereto and hereby incorporated by reference herein. In *Prouse* a patrolman in a police cruiser pulled a motor vehicle over with absolutely no reason whatsoever. *The patrolman was not acting pursuant to any standards, guidelines, or procedures pertaining to document spot checks.* Therefore, it is obvious that *Prouse* has no significance whatsoever in relation to the case of *State v. Goehring*. The leading case decided by the United States Supreme Court which does have bearing is *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 18 L.Ed. 930, 87 S.Ct. 1727 (1967). A copy of that case is attached hereto and hereby incorporated by reference herein. Notably, the United States Supreme Court has cited the *Camara* case and upheld procedures similar to that used in this case in such cases as *Donovan v. Dewey*, 359 U.S. 360, 79 S.Ct. 804 [452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262] (1981); *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642 [68 L.Ed.2d 38] (1981); and *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338 [62 L.Ed.2d 238] (1979)." [Emphasis added.]

In light of this response by the State, we do not believe that the title of the motion caused the State to overlook the substantive issue and respond procedurally only as though this were a motion to dismiss.

While the initial motion should have been titled a motion to suppress, to deny the motion for this reason would elevate form over substance, would result in an unreasonably stringent interpretation of the procedural rules and would ignore the underlying policy behind the rules.

## II

Having disposed of the procedural issues, we must now address the substantive question; the constitutionality of the search leading to Goehring's arrest.

Much of Goehring's argument for classifying his arrest as unconstitutional is based on *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. at 1391. Goehring emphasizes that in *Prouse* the Supreme Court held that,

"except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." 440 U.S. at 663, 99 S.Ct. at 1401.

Goehring points out that Officer Brand had no reason to suspect he was driving with a suspended driver's license. The Court, however, limited this ruling when it said:

"This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbri-

dled discretion of police officers." *Id.* (Footnote omitted.)

Goehring acknowledges this qualification to the prohibition against spot checks, but argues in his brief that a roadblock-type stop referred to by the Supreme Court must question *all* oncoming traffic; that the stop must be a "100% roadblock" to avoid the unconstrained exercise of discretion and fall within the realm of constitutionality. We disagree. The Court was, in our view, merely suggesting "one possible alternative" when it suggested stopping *all* oncoming traffic. *Id.* Justice Blackmun, in his concurring opinion in *Prouse,* explains that, "The roadblock stop for all traffic is given as an example. I necessarily assume that the Court's reservation also includes other not purely random stops (such as every 10th car to pass a given point) that equate with, but are less intrusive than, a 100% roadblock stop." 440 U.S. at 664, 99 S.Ct. at 1401.[3]

The Tenth Circuit has held that a 100% roadblock is not necessary for constitutionality. In a case in which the New Mexico state police, in order to prevent a hazardous situation, did not stop all vehicles, the Tenth Circuit held that the stop was constitutional. *United States v. Prichard,* 645 F.2d 854, 857 (1981), *cert. denied,* 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981), *reh'g denied,* 454 U.S. 1069, 102 S.Ct. 620, 70 L.Ed.2d 605 (1981). "While this may not have been a '100% roadblock' of the type referred to in *Prouse,* it is nonetheless a long way from the selective, single car stop denounced in *Prouse.*" 645 F.2d at 856. *See also State v. Shankle,* 58 Or.App. 134, 647 P.2d 959 (1982).

 When determining whether or not a particular governmental activity is constitutionally permissible, it must be analyzed according to the appropriate constitutional test. "[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's

---

**3.** In oral argument counsel for Goehring seemed to concede that the Court in *Prouse* did not mean to say that stopping all cars was a necessity but that the stopping had to be pursu-

ant to a system which took away from the officer the right to exercise "unbridled discretion."

Fourth Amendment interests against its promotion of legitimate governmental interests." *Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396. There are several factors to be considered when applying this balancing test: the importance of the governmental interest at stake, the amount of physical and psychological intrusion upon the individual's Fourth Amendment interests, the subjectiveness of the intrusion, the availability of practical alternatives, and the efficiency of the procedure used. 440 U.S. at 655–663, 99 S.Ct. 1396–1401.

Goehring argues that the procedure used in this case, like *Prouse,* is unconstitutional because of the discretion vested in the police officers and because of the intrusiveness involved in examining Goehring's driver's license. While *Prouse,* in some respects, is factually similar to the case before this Court, there are differences which distinguish the two cases. In *Prouse,* a patrolman randomly stopped a vehicle for the sole purpose of checking the operator's driver's license and the vehicle's registration. "The patrolman was not acting pursuant to any standards, guidelines, or procedures pertaining to document spot checks, promulgated by either his depart-

ment or the State Attorney General." 440 U.S. at 650, 99 S.Ct. at 1394. The patrolman testified, " 'I saw the car in the area and wasn't answering any complaints, so I decided to pull them off.' " 440 U.S. at 650–651, 99 S.Ct. at 1394. As the patrolman approached the car he smelled marijuana. He also observed and seized marijuana in plain view on the car floor. The trial court granted the defendant's motion to suppress, ruling that the stop had been violative of the defendant's Fourth Amendment rights. The Delaware Supreme Court and United States Supreme Court affirmed.

The case now before our Court arose from somewhat different circumstances. Officer Brand had positioned himself on the shoulder of the highway for the purpose of conducting safety checks. He testified that he conducted this safety check in accordance with set policies and procedures which he had learned at the academy. After Officer Brand completed the safety inspection, he requested to see Goehring's driver's license. This is also in accordance with the normal procedures of a safety check.[4]

---

4. Goehring alleged that asking for a driver's license was not Officer Brand's routine procedure but was instead at his complete discretion and based upon whether or not he knew the driver. This allegation is based on the following testimony given by Officer Brand at trial:

DIRECT–EXAMINATION

"Q Were there irregularities about that license?

"A At the time I don't remember if I noticed it right away. I then noticed it was expired. Usually what I do when I want to run a check I walk to the vehicle and take a look at it.

"Q Do you normally ask for identification on production of a driver's license when you conduct this random check?

"A I do, personally.

"Q In every instance?

"A The only time that I probably wouldn't do it is if I knew the individual, say, somebody from my hometown that I know has a driver's license.

"Q What's the purpose of making the random check?

"A We like to have people carry their driver's license with them."

CROSS–EXAMINATION

"Q Was Mr. Goehring cooperative?

"A I had no problem with Mr. Goehring.

"Q It was not until after you had completed the inspection that you demanded the license?

"A Yes.

"Q And you stated in response to Mr. Goter's question you did not demand a license in every instance based upon your judgment, basically?

"A I would say that normally I do ask for it. Again, if I say if I knew you personally and you came by and I did a vehicle check and we had a conversation, and I asked you how you were doing, then, I wouldn't ask for it.

"Q Would you know, though, if necessarily all the people within your group or people you know whether or not their license is under suspension?

"A In Oliver County I know how many people are under or on the suspension list.

"Q And you know, say, a businessman or somebody you know personally, if he's on the suspension list? By the suspension list, is that the one maintained by the State Radio or State Patrol?

"A It's maintained by the driver's license division and sent out to the various law enforcement agencies."

■ What disturbed the Court in *Prouse* was the patrolman's "unconstrained exercise of discretion." 440 U.S. at 655. Such an unconstrained exercise of discretion would allow a patrolman to stop any car, at any time, and under any procedure the patrolman desired, just to check the validity of the operator's driver's license or vehicle registration. Complete discretion of a governmental official infringes upon the basic purpose of the Fourth Amendment "to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials." *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 528–533, 87 S.Ct. 1727, 1730–1733, 18 L.Ed.2d 930 (1967).

■ While the facts in this case may distinguish it from *Prouse*, the underlying principle still remains; that is, there must not be "unbridled discretion" vested in police officers. We acknowledge that Officer Brand testified several times that he was acting in accordance with standard procedures that he had learned in the academy. However, nowhere in the record or Officer Brand's testimony is it indicated what these procedures are.[5] We have no way of knowing whether these procedures allow officers no discretion, some discretion, or total discretion in deciding which vehicles are flagged over and checked. Without knowing what these procedures are, and the amount of discretion vested in the police officers, we can hardly rule that these procedures are in conformity with the constitution and the principles of *Prouse*.

■ Where the defendant asserts a violation of the Fourth Amendment search provisions, the burden of proof on a motion to suppress is on the State. *State v. Abrahamson*, 328 N.W.2d 213, 217 (N.D.1982); *State v. Swenningson*, 297 N.W.2d 405, 406 (N.D.1980). Here, the State submitted no evidence to prove the procedures used by Officer Brand were in compliance with the Fourth Amendment. The State has not met its burden and the judgment of the trial court must therefore be reversed.

GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.

---

Also relevant is Officer Brand's affidavit which states:
> "Following the vehicle inspection, I requested that the driver produce his license. This is also in accordance with standard operating procedure when conducting a vehicle safety check."

This testimony, in our view, does not support Goehring's argument that Officer Brand acted with complete discretion when asking to see a driver's license. On the contrary, this testimony along with the affidavit indicates that Officer Brand consistently asks for a license but would make an exception to this rule if he "knew" the driver had a valid license.

5. The only evidence relating to the procedure in determining which vehicles to stop is Officer Brand's affidavit stating: "This involves stopping my patrol vehicle and flagging over as many vehicles as I felt I could efficiently examine without any unnecessary delay or inconvenience to the drivers," and his testimony at trial stating: "We like to pull over a vehicle so the other traffic doesn't have to wait very long. We don't like to pull over 30 cars."